J-S23023-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYRELL BISHOP | : | |
| | : | |
| Appellant | : | No. 2264 EDA 2015 |

Appeal from the Judgment of Sentence Dated March 9, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0001140-2014

BEFORE:  OLSON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                          **FILED JULY 31, 2017**

Appellant Tyrell Bishop appeals from the judgment of sentence imposed by the trial court after he was convicted by a jury of aggravated assault, violations of the Uniform Firearms Act, and possession of an instrument of crime ("PIC").[1]  We affirm.

On November 9, 2013, at around 10:50 p.m., Kyree Silver was in the area of 10th and Norris Streets in Philadelphia, where he had a verbal altercation with an unidentified man.  Appellant was present at that altercation.  Trial Ct. Op. at 2 (citing N.T., 12/17/14, at 26-27, 29-31).  As

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 6105(a)(1), 6106(a)(1), 6108, and 907(a), respectively.

Silver and his friend, Nasir,[2] began to walk down the street, Nasir told Silver, "Hey, bro, you are being followed." N.T., 12/17/14, at 32. The man following them was wearing a white thermal shirt, khaki pants, and Timberland boots. *Id.* at 33-34, 37. Appellant then yelled to Silver, and Silver turned around and walked into the middle of the street, where Appellant began shooting at Silver. At first, Silver stood in shock, but, after the second shot, he began to run towards an intersection, at which time he was struck by a bullet. Silver nevertheless was able to pick himself up and run two more blocks. Trial Ct. Op. at 3 (citing N.T., 12/17/14, at 34).

Temple University Police Officer Robert Acosta, who had received a radio call reporting a shooting in the area, found Silver and placed him into another officer's patrol car to be transported for medical attention. N.T., 12/18/14, at 24-25. Silver was taken to Temple University Hospital, where "it was determined that [he] had been shot in his left side, and that the bullet hit his spine." Trial Ct. Op. at 2 (citing N.T., 12/17/14, at 39).

Officer Acosta then returned to the scene of the crime, where he "noticed someone" inside a building, through an open door, "who was sitting on a chair fitting the doer's clothing," which had been described in the radio call as "tan boots with light color shirt, possibly a thermal." N.T., 12/18/14, at 29-30. The person then closed the door. Officer Acosta later testified

---

[2] Silver testified that he could not recall Nasir's family name. N.T., 12/17/14, at 28. Appellant's Brief, at 7, identifies Nasir's last name as Abdul-Raheem.

that he "really can't say" whether the person he saw was Appellant, despite being able to recognize Appellant from "see[ing] him around the area." *Id.* at 34.

On November 14, 2013, Silver identified Appellant as the shooter after viewing a photo array. On December 28, 2013, Philadelphia Police executed a search warrant on Appellant's home and recovered "a tan pair of khaki pants, a tan pair of Timberland boots, and mail in the name of [Appellant]." N.T., 12/18/14, at 147-49. They arrested Appellant that same day.

Appellant was indicted for the shooting on January 27, 2014, and a jury trial ultimately was scheduled for December 2014. During that interval, Silver received an unsigned handwritten letter addressed to him at his home. The letter was postmarked April 2, 2014, and urged Silver not to testify at trial and to lie if he was asked if he recognized Appellant during a line-up. Ex. C-30.[3] The Commonwealth later produced transcripts of taped conversations by Appellant with friends and family members in which he

---

[3] The letter said, in part:

> . . . Just do the right thing . . . . You see how easy it was to get your address . . . . I could of provoked some violence[.] My man told me not to tho. This what I need you to do, My man trying to get a line-up as we speak so if they grant it, Just go to da jawn, n act like you lookin real hard then say "I dont see em[.]"

Ex. C-30 (identified at trial as part of C-25-A). The letter continued by advising Silver that trial was scheduled for mid-December and that Silver should "show up there" and, if called to testify, say that he identified Appellant under police duress. It told Silver to keep his dispute with Appellant in "the streets" and not to "take it to the courts." *Id.*

appeared to discuss trying to dissuade Silver from testifying. Exs. C-32, C-34; N.T., 12/19/14, at 21-27.

Prior to trial, the parties engaged in motion practice regarding the Commonwealth's plan to introduce information that it contended was from Appellant's social media accounts. On November 18, 2014, the Commonwealth provided Appellant with a numbered exhibit packet. Exhibits C-37 to C-47 of the packet – which were renumbered as Exhibits C-36 to C-46 at trial – were described by the Commonwealth as screenshots from a Facebook account[4] registered under the name "Traplife Took." The Commonwealth contended that "Traplife Took" was a nickname used by Appellant and that the exhibits were from Appellant's Facebook account.[5] At

---

[4] We recently described Facebook as follows:

> Facebook is a social networking site where "[u]sers of that Web site may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted." *Elonis v. United States*, ––– U.S. ––––, 135 S.Ct. 2001, 2004, 192 L.Ed.2d 1 (2015).

*Nicolaou v. Martin*, 153 A.3d 383, 387 n.2 (Pa. Super. 2016) (*en banc*). Another exhibit was described as containing messages, or "tweets," from Appellant's Twitter account. *See generally Nixon v. Hardin Cty. Bd. of Educ.*, 988 F. Supp. 2d 826, 830 n.1 (W.D. Tenn. 2013) (describing the Twitter social media service). Although the Twitter messages were the subjects of disputes in the trial court, Appellant's brief does not discuss them, and we therefore will not address them here.

[5] Apart from the fact that the Facebook pages showed a number of images of Appellant, the Commonwealth relied on the fact that, after Appellant's arrest, Appellant's brother, Daryl Bishop, tweeted, "Free tookey" and "Free

trial, Appellant challenged the authenticity of the Facebook messages, but he has abandoned those arguments on appeal and does not contend in this Court that the Facebook account of "Traplife Took" was not his.

The Facebook messages, including those at Exhibits C-37/36 to C-39/38,[6] contained a number of photographs of Appellant, including one showing him a few blocks from the location of the shooting. Exhibit C-41/40 contained a message stating: "Neighborhood dangerous,, whole lotta shootas,,,, had to keep a Mac n I ain't talkin bout computers,," (punctuation in original). Exhibit C-42/41 stated, "Gotta 40 n a 9 at da SAME DAMN TIME. . #TEAM BIZZY. . I'm on ma militant shit . . ." (capitalization and punctuation in original). Exhibit C-43/42 stated: "Death before dishonor,,,, don't even bother.. Take me back to prison I don't kno shit, ya honor..... #snitches get stitches. . . N I don't like stitches" (punctuation in original). The posting dates of the messages were in May or June of 2012 (about 1½ years before the shooting of Silver).

On December 12, 2014, Appellant filed a pre-trial motion *in limine* to prohibit the introduction of any social media evidence, arguing that Appellant's "social media accounts are irrelevant and inadmissible." Mot. *in*

_____

took," which the Commonwealth contended was proof that "Took" was Appellant's nickname. N.T., 12/18/14, at 108; Ex. C-48, C-51 & C-52.

[6] The number before the slash is the exhibit number in the original discovery packet; the number after the slash is the exhibit number at trial. For example, Exhibit C-37/36 was Exhibit C-37 in the discovery packet but Exhibit C-36 at trial.

*Limine*, 12/12/14, at 3 ¶ 7.4. Appellant stated that "[t]he entirety of the Facebook and Twitter posts are the equivalent of braggadocio and rap lyrics — what Tipper Gore feared in the early 90s." ***Id.*** at 4 ¶ 10.2.[7] The trial court denied the Motion *in Limine* and allowed the Commonwealth to introduce the social media evidence at trial. Trial Ct. Op. at 9.

During trial, Silver testified that he saw Appellant follow him and heard Appellant "yell something out." Trial Ct. Op. at 4; ***see also*** N.T., 12/17/14, at 32-33. Throughout his testimony, Silver identified Appellant as the individual who shot him, and Silver's testimony was corroborated by a surveillance video that recorded a portion of the incident. Ex. C-5; N.T., 12/17/14, at 35; Trial Ct. Op. at 4-5, 8. During his testimony, Silver identified himself in the video. Also during the trial, Appellant stipulated that he had a prior felony conviction that made it unlawful for him to possess a firearm and that he did not have a license to carry a firearm. Ex. C-24; N.T., 12/14/14, at 84; N.T., 12/22/14, at 14.[8]

---

[7] Appellant also argued that the social media evidence should be excluded under Evidence Rule 404 (relating to character evidence). Mot. *in Limine*, at 4 ¶ 11. Appellant has abandoned that challenge on appeal.

[8] The notes of testimony from December 22, 2014, are mislabeled as "November 22, 2014." For clarity, this Court will refer to this volume by the date the proceedings actually occurred and not by the date indicated on the cover page.

On December 22, 2014, a jury found Appellant not guilty of attempted murder[9] and guilty of the remaining charges enumerated above. On March 9, 2015, Appellant was sentenced to an aggregate term of eighteen to thirty-six years' incarceration.

On March 18, 2015, Appellant filed a motion for reconsideration of his sentence, which the trial court denied on July 17, 2015. On July 27, 2015, Appellant filed a notice of appeal to this Court. Appellant's appeal raises two issues for our review:

> 1. Was there insufficient evidence to convict [A]ppellant of the offenses of Aggravated Assault, Violation of the Uniform Firearms Act §§6105, 6106, & 6108, and Possession of an Instrument of Crime due to conflicting testimony and a lack of physical evidence, such th[at] he should be granted a new trial?
>
> 2. Did the trial court err in allowing the introduction of [A]ppellant's social media posts belonging [*sic*] where the posts were irrelevant to the charges at issue, and where the probative value of the accounts were outweighed by the prejudice to the [A]ppellant under Pa.R.E. 403, such that he should be granted a new trial?

Appellant's Brief at 4.

## Sufficiency of the Evidence

Appellant first contends that "the evidence presented at trial was insufficient to sustain a verdict of guilt[y] because responding Temple Police Officer Robert Acosta's testimony established that [Appellant] was not

---

[9] 18 Pa.C.S. § 901(a).

identified on the scene of the shooting on November 9, 2013 and no physical evidence linked Appellant to the shooting." Appellant's Brief at 13.[10]

We have explained:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.... When reviewing a sufficiency claim the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

As a reviewing court, we [may] not weigh the evidence or substitute our judgment for that of the fact-finder, who is free to believe all, part, or none of the evidence.

***Commonwealth v. Chambers***, 157 A.3d 508, 512 (Pa. Super. 2017) (citations omitted).

Here, Officer Acosta's testimony is irrelevant in determining the shooter's identity because Silver himself identified Appellant as the shooter, with video evidence corroborating this identification. Trial Ct. Op. at 4-5 (citing Ex. C-5). This Court cannot substitute its own judgment for that of the fact-finder and thus cannot consider Officer Acosta's failure to identify Appellant of greater evidentiary value than the identification by Silver and

---

[10] Although Appellant generally challenged the sufficiency of the evidence for all of his convictions under Pa.R.A.P. 1925(b), at 1 ¶ 1, Appellant did not specify in his Statement that his sufficiency challenge was based upon Officer Acosta's testimony or the alleged lack of physical evidence. Thus, the trial court did not explicitly address Officer Acosta's testimony and the asserted absence of physical evidence in its opinion of June 6, 2016. ***See*** Trial Ct. Op. at 4-7.

the supporting video. *See Chambers*, 157 A.3d at 512; *see also* N.T., 12/18/14, at 34; Trial Ct. Op. at 4-5 (citing Ex. C-5). The jury was "free to believe all, part, or none of the evidence," placing whatever value it considered appropriate on Silver's and Officer Acosta's testimony and on the video evidence. *Chambers*, 157 A.3d at 512. We cannot say that the jury should have interpreted the evidence presented at trial in the way that Appellant wishes. Rather, we must view the evidence "in the light most favorable to the verdict winner," *id.*, which means that we must look to the evidence identifying Appellant, rather than to that regarding Officer Acosta's inability to state with certainty that he saw Appellant. *See also* N.T., 12/18/14, at 34; Trial Ct. Op. at 4-5 (citing Ex. C-5). We note that Officer Acosta never identified anyone else as the person in the open door. N.T., 12/18/14, at 29-30, 34.

Furthermore, Appellant's general assertion that there was no physical evidence connecting him to the crimes is undermined by the video corroborating Silver's testimony. Ex. C-5. *See Commonwealth v. McKellick*, 24 A.3d 982, 987 (Pa. Super.) (referring to a "video tape" as "demonstrative or physical evidence"), *appeal denied*, 34 A.3d 828 (Pa. 2011); *Commonwealth v. Conway*, 534 A.2d 541, 544 n.3 (Pa. Super. 1987) (same), *appeal denied*, 549 A.2d 914 (Pa. 1988). Appellant argues that, "[t]hrough the course of [this] investigation, no firearm was ever recovered and no gunshot residue testing was ever performed on clothing

recovered from [Appellant]'s home." Appellant's Brief at 21. However, it is the "totality of the circumstances" that is "determinative, not the presence or absence of any particular piece of evidence." ***Commonwealth v. Harper***, 611 A.2d 1211, 1217 (Pa. Super. 1992). Thus, the absence of a recovered firearm or ballistics evidence does not make the evidence on which Appellant's guilt was based insufficient. ***See id.*** The jurors found the evidence presented to be sufficient, and we will not substitute our judgment for theirs. ***See Chambers***, 157 A.3d at 512.

## Appellant's Social Media Postings

Appellant's remaining issue is that the trial court abused its discretion in admitting evidence of his social media postings.

> The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

***Commonwealth v. Woodard***, 129 A.3d 480, 494 (Pa. 2015) (quotation marks and citations omitted), ***cert. denied***, 137 S. Ct. 92 (2016).

Appellant first argues that the social media postings were not relevant, that the trial court abused its discretion in admitting them, and that he "suffered actual harm via unfair prejudice." Appellant's Brief at 25, 28. The Commonwealth counters that "the evidence recovered from [Appellant's] social media accounts . . . was highly relevant as it went to [his] access to

weapons, presence in the area of the crime, and consciousness of guilt."

Commonwealth's Brief at 13. The trial court stated:

> "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." ***Commonwealth v. Antidormi***, 84 A.3d 736, 750 (Pa. Super. 2014). In the case at hand, the Facebook posts were relevant since they were demonstrative of guilt. In these posts, Appellant indicates that he is in possession of a firearm, stating: "neighborhood is dangerous, whole lotta shooters, had to keep a Mac, and I ain't talking about computers" and "got a 40 and a nine at the same damn time." Appellant additionally posted the following: "Death before dishonor. Don't even bother. Take me back to prison. I don't know shit, Your Honor #snitches get stiches and I don't like stitches." This post tends to support the assertion that Appellant had others call, text, and write letters to the witness with the intent to intimidate. It clearly shows Appellant's views on snitches. This assertion was further authenticated by a letter admitted into evidence as Commonwealth Exhibit C-30, which was delivered to Kyrie Silver's home and urged the complainant to not identify the Appellant.

Trial Ct. Op. at 10-11 (footnotes omitted). We conclude that the trial court did not err in holding that the proffered social media postings were relevant.

Under the Rules of Evidence, "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "[T]he threshold for relevance is low due to the liberal '*any* tendency' prerequisite." ***Brady v. Urbas***, 111 A.3d 1155, 1162 (Pa. 2015) (emphasis in original; citing Pa.R.E. 401).

In **Commonwealth v. Patterson**, 91 A.3d 55, 74 (Pa. 2014), **cert. denied**, 135 S. Ct. 1400 (2015), Patterson sent a letter to two friends that included a lyric from a song entitled "Homeboyz" by Tupac Shakur: "When I give the word tear that ass out of that frame." Five days later, one of the friends fatally shot another man. **Id.** at 61. The Commonwealth introduced the letter as evidence that Patterson's inclusion of the lyric in his letter pre-dating the murder was a request to his friend to kill the victim. **Id.** at 74. Appellant objected, arguing in part that the song lyric found in his letter was not relevant. **Id.** at 75. The trial court allowed its admission, and the Supreme Court of Pennsylvania found no merit to Patterson's argument on appeal. **Id.** The Supreme Court stated that Patterson's claims went "to the weight of the evidence, and a witness's credibility is for the finder of fact"; "it was for the jury to determine whether they believed Appellant" regarding his use of the lyric; and "to the extent Appellant contends that his cross-examination regarding the lyrics was 'highly prejudicial,' . . . most relevant evidence is, in fact, prejudicial." **Id.** at 75-76.

In **Commonwealth v. Ragan**, 645 A.2d 811, 820 (Pa. 1994), lyrics to a rap song recorded by Ragan's musical group were held to have been properly admitted, because the lyrics were introduced in response to testimony on direct examination in which the appellant had portrayed himself as a college student and artist. The Supreme Court stated, "fruits of

appellant's artistic leanings were clearly relevant to rebut this testimony."

*Id.*

For similar reasons, the social media evidence at issue here was relevant. First, because Appellant was on trial for firearms violations, his ownership of guns and his statements about access to guns were relevant to the Commonwealth's case. *See* Pa.R.E. 401-402. The Commonwealth presented evidence by James Stinsman, an assistant district attorney with experience in the Gun Violence Task Force, that the postings' references to keeping a "Mac" and having a "40 [and] a 9" pertained to possession of handguns. N.T., 12/18/14, at 103-04. In addition, Appellant's postings were admissible to rebut any argument that Appellant had not obtained a firearm until after the date of the shooting. *See Ragan*, 645 A.2d at 820.

The postings also were evidence that Appellant may have sought to intimidate Silver from testifying — evidence that is relevant to show consciousness of guilt. *See Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007), *cert. denied*, 552 U.S. 1316 (2008). The Commonwealth submitted evidence of possible intimidation, including the letter that Silver received at his home prior to trial.[11] Appellant's Facebook posting expressing his view about the adverse consequences of being a "snitch"

---

[11] Appellant does not challenge the admissibility of that letter or other evidence of possible intimidation in his appeal.

supported the contention that Appellant might wish to deter Silver from being a witness against him.

Appellant also argues that the social media postings were more prejudicial than probative. Appellant's Brief at 25, 28-31. In this connection, he emphasizes that the postings were rap lyrics, a form of artistic expression, and posits that, if "[A]ppellant had posted to his Facebook wall, 'I shot a man in Reno, just to watch him die' the trial court would not have considered those lyrics to have been probative of the fact that [A]ppellant had a gun and he shot someone." *Id.* at 28-30.[12] Appellant recognizes that the mere fact the postings may be song lyrics does not make them inadmissible, and he acknowledges that we held rap lyrics admissible in **Commonwealth v. Talbert**, 129 A.3d 536 (Pa. Super. 2015), **appeal denied**, 138 A.3d 4 (Pa. 2016).[13] But he claims that, unlike the

---

[12] Appellant's reference is to a famous lyric in "Folsom Prison Blues" by Johnny Cash. **See** John R. Cash, *Folsom Prison Blues* (Sun Records 1955).

[13] In **Talbert**, 129 A.3d at 538, 540, the appellant asserted "that the trial court erred in admitting as evidence a rap music video [that appellant had uploaded to YouTube approximately a month after the crime] that allegedly contained lyrics describing a crime similar to the murders at issue in this case." The Commonwealth proffered the appellant's rap lyrics to corroborate his role as one of the shooters. *Id.* at 544. The appellant "suggest[ed] that there were inconsistencies between the facts of the crime and the common slang meaning of the words in the rap song" that should preclude their admissibility. *Id.* at 541. This Court disagreed, concluding that any inconsistencies were "not enough to change the overall meaning of the rap lyrics." *Id.* at 541. We asserted that the rap video was relevant and admissible to show the appellant's involvement in the murders, "despite the potentially prejudicial impact of artistic works." *Id.* at 542.

lyrics in **Talbert**, the postings here were not original[14] and did not show any clear relation to the events of the crime. He also contends that "the trial court either glosses over or ignores the fact that [A]ppellant posted a rap artist's lyrics to his Facebook wall **nearly 18 months before** . . . the events in this case." Appellant's Brief at 28 (emphasis in original).

"The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Evidence is not unfairly prejudicial simply because it is harmful to the defendant's case. Rather, exclusion of evidence on this ground is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." **Commonwealth v. Foley**, 38 A.3d 882, 891 (Pa. Super. 2012) (internal quotation marks and citation omitted), **appeal denied**, 60 A.3d 535 (Pa. 2013).

Here, the trial court concluded that Appellant's postings "credited the assertions that Appellant owned a firearm, and that he supported witness

---

[14] In his brief, Appellant contends (without a citation to the record) that he presented evidence that the postings were from lyrics by a local Philadelphia rapper named "Oschino." Appellant's Brief at 27. Our review of the record reveals only that Appellant asked a Commonwealth witness whether the postings were lyrics from another artist and the witness responded that he did not know. N.T., 12/18/14, at 111-12.

intimidation tactics." Trial Ct. Op. at 12. Appellant disagreed with the these interpretations, but the fact that this evidence could be interpreted differently by the jury does not mean it was inadmissible.

In **Commonwealth v. Johnson**, 838 A.2d 663, 680 (Pa. 2003), **cert. denied**, 543 U.S. 1008 (2004), the defendant, before his trial, approached a witness and said, "[I]t's kind of f____ed up when people's families die." 838 A.2d at 679 (letters omitted in original). The defendant argued that the statement was not admissible, because "it [was] not clear that the comments were intended as a threat." **Id.** at 680. The Supreme Court of Pennsylvania held that, regardless of whether the defendant's words constituted a threat, they were admissible because they were probative of an intent to influence the witness's testimony. **Id.** Similarly, in **Commonwealth v. Kramer**, 371 A.2d 1008, 1011-12 (Pa. Super. 1977) (*en banc*), the defendant wrote a letter to his wife stating, "[w]hen I get out of here I am going to get a gun and you know what I am going to do"; the letter was deemed admissible even though the defendant said he was referring merely to hunting. We held that the true meaning of the statement was within the province of the jury. **Id.** Thus, interpreting whether Appellant's postings actually mean that he owned a firearm or supported witness intimidation was within the province of the jury. **See id.**

The fact that the postings were made more than a year before the shooting of Silver did not mean that the jury could not consider them. In

- 16 -

***Patterson***, 91 A.3d at 75, the Supreme Court held that a writing by the appellant that included a third party's lyrics and that pre-dated the crime was admissible and any concerns about its connection to the crime went "to the weight of the evidence." Analogously, here, the date of the postings went to the weight of the evidence, not their admissibility. ***See Commonwealth v. Hanible***, 30 A.3d 426, 464 (Pa. 2011) ("the lack of conclusive proof" to support an inference "went to the weight, rather than admissibility, of the evidence"), ***cert. denied***, 133 S. Ct. 835 (2013).

Finally, even if the admission of Appellant's social media postings was erroneous, the admission was harmless error.

> The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. ***See Commonwealth v. Story***, 476 Pa. 391, 383 A.2d 155 (1978). The proper analysis to be undertaken was thoroughly explained in ***Story***:
>
>> This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If "honest, fair minded jurors might very well have brought in not guilty verdicts," an error cannot be harmless on the basis of overwhelming evidence. Once the court determines that the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict.
>
> We have cautioned that:

> "a conclusion that the properly admitted evidence is 'so overwhelming' and the prejudicial effect of the.... error is 'so insignificant' by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly."
>
> Accordingly, we have been reluctant to find an error harmless on the basis of overwhelming evidence.
>
> *Id.* at 412–413, 383 A.2d at 166 [footnote omitted; citations omitted].

***Commonwealth v. Rasheed***, 640 A.2d 896, 898 (Pa. 1994).

Here, the Commonwealth's key witness was the victim himself, who identified Appellant as the individual with whom he had an altercation and who shot him. Ex. C-5; N.T., 12/17/14, at 35; Trial Ct. Op. at 4-5, 8. Surveillance video recorded part of the incident. When Appellant's home was searched, police found clothing identical to what Silver said Appellant was wearing on the night of the shooting. N.T., 12/17/14, at 37; N.T., 12/18/14, at 147-49. The Commonwealth also introduced transcripts of recordings by Appellant encouraging family and friends to prevent Silver from testifying. Exs. C-32, C-34; N.T., 12/19/14, at 21-27. The properly admitted evidence of guilt thus was overwhelming, and the prejudicial effect of any error was insignificant by comparison. ***See Rasheed***, 640 A.2d at 898. Hence, it is clear beyond a reasonable doubt that any error arising from the admission of Appellant's social media postings during trial could not have contributed to the verdict and thus was harmless. ***See id.***

For all of these reasons, we conclude that Appellant's challenge to the social media postings is without merit. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2017